UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

KEONTE FURDGE,

    *Plaintiff,*

        v.

                        Case No. 3:20-cv-00846

CITY OF MONONA et al.,

    *Defendants.*

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Plaintiff Keonte Furdge, by his attorneys, Strang Bradley, LLC, submit the following brief in support of the Plaintiff's Motion for Partial Summary Judgment. The police officer Defendants, Jared Wedig and Luke Wunsch, unreasonably seized Furdge by entering his home without a warrant, without consent, and without an exception to the warrant requirement. U.S. Const. Amend. IV. *Payton v. New York*, 445 U.S. 573 (1980); *Minnesota v. Olson*, 495 U.S. 91 (1990); *Richards v. Wisconsin*, 520 U.S. 385 (1997); *see Reardon v. Wroan*, 811 F.2d 1025 (7th Cir. 1987); *see Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005); *see also Frunz v. Tacoma*, 468 F.3d 1141 (9th Cir. 2006).

They further unreasonably seized Furdge without reasonable suspicion by pointing guns at him and handcuffing him, after they had already unlawfully entered his home. *Terry v. Ohio*, 392 U.S. 1 (1968); *see Hawkins v. Mitchell*, 756 F.3d 983 (7th Cir. 2014).

## I.  INTRODUCTION

Keonte Furdge did nothing wrong. He stayed overnight with his close friend, Toren Young, at the house Young had just moved into. In the morning, he walked Toren out to his car for a job interview and then sat on the porch. He went inside to fold laundry. And the next thing he knew, he was being accosted at gunpoint and handcuffed by Officers Wedig and Wunsch.

This is exactly why the Fourth Amendment creates so much protection for the home. *See Payton*, 445 U.S. 573. When an officer enters a home, on only the word that a house should be vacant and a "suspicious" person was seen sitting on the steps in broad daylight, he can't be surprised to find out that a person is living there. The officer has already been warned by the Fourth Amendment and its caselaw. And that's what we have here. Just a report from a witness who left the area after making a call on a non-emergency line, and a confirmation by her boyfriend that indeed the house should be vacant. And the officers entered the house anyway.

No reports of a burglary. No reports of any crime. No signs of forced entry. No signs of weapons. No signs of drugs. Not in a bad neighborhood. No signs of disorder in the front window. No investigation of the back of the house. No talking to any other neighbors. No trying to call the owner of the house. *No application for a warrant*. There's a reason warrantless entry into a home is *presumptively* unreasonable. *Payton*, 445 U.S. at 586.

This is also exactly why the Fourth Amendment requires an officer to knock and announce his presence. *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995). If the officers here had

knocked or rang the doorbell, they would never have even wanted to enter the house. Instead, Wedig turned the doorknob and opened the door, with no signs of forced entry. Instead, Wedig, again opened the door without further investigation. Instead, Wedig, now with Wunsch in tow, entered the house now only hearing that there was a voice inside. Again, they saw no signs of forced entry, had no reports of a crime in progress, and saw nothing amiss in the house. Instead, the officers found a young man, shocked to see guns pointed at him, in an undershirt, unprepared for police contact.

And this is also exactly why the decision to enter a home is left to a neutral magistrate. *Payton*, 445 U.S. at 602. Our Fourth Amendment jurisprudence expressly doesn't trust officers to make the all-important decision to enter a home. *Id.* at 586, n.24. It knows that officers are likely to be blinded by their desire to find crime. *Id.* And that's what happened here. Wedig's imagination ran away from him. He assumed there was an ongoing burglary without any evidence beyond a non-emergency call for a suspicious person. Our jurisprudence warned him of his own hubris, and he did it anyway. *Cf. Terry v. Ohio*, 392 U.S. 1, (entrusting officers to detain without a warrant, based on reasonable suspicion that is not "the product of a volatile or inventive imagination").

## II.  FACTS

### A.  Keonte Furdge stays as an overnight guest at his friend Toren Young's house.

The below facts are a summary and are not as thorough as Plaintiff's Proposed Findings of Fact (PPFOF).

In June of 2020, Plaintiff Keonte Furdge is down on his luck. PPFOF, ¶¶18–19. Although he is a nice, polite young man, he is laid off from work because of the pandemic and is crashing on friend's couches. *Id.*, ¶¶18–19, 96, 106.

Furdge's close friend and former football teammate, Toren Young, however, had some good news. *Id.*, ¶22. Young was moving back to the Madison area from Iowa. *Id.*, ¶12. And Young had received permission from a former coach of Young and Furdge's to stay at the coach's parents' house for a couple of months. *Id.*, ¶¶9, 13, 130. The house was vacant because the coach's parent had died about a year earlier. *Id.*, ¶10. The coach, Mark Rundle, was maintaining the house and told Young that he wished Young could just buy the house from him. *Id.*, ¶16.

And so the good news, Young tells Furdge he can come stay with him. *Id.*, ¶20. The house is in Monona, at 5111 Arrowhead Drive ("the house"). *Id.*, ¶1. Furdge heads over, starts some laundry, and the two friends catch up and have dinner. *Id.*, ¶22.

It was a stressful time. The day was June 1st, 2020. *Id.*, ¶1. It was just days after the death of George Floyd, there had been protests in Madison and Monona, and the world was in the midst of a pandemic. *Id.*, ¶¶8, 18.

Furdge and Young went to bed in the house; things were looking up. *Id.*, ¶23. The next morning, Young has a job interview. *Id.*, ¶25. At about 9:30am, Furdge helps Young tie his tie and walks him out to his car to send him off. *Id.*, ¶26.

Furdge's plan is to hang back at the house for the day and get settled. *See id.*, ¶¶27–28, 30. He sits down on the front steps of the house. *Id.*, ¶27. And he calls a friend to talk about how nice the new neighborhood is. *Id.*, ¶28. He then walks back into the house and

goes into his room, the guest bedroom, to finish his laundry from the night before. *Id.*, ¶30.

### B. A neighbor calls the non-emergency line to report a suspicious person sitting on the steps of 5111 Arrowhead drive.

Unbeknownst to Furdge, his relaxing on the porch, had sparked suspicion on the street. *Id.*, ¶32. Furdge, like Young, is black. *Id.*, ¶31. A neighbor had called the non-emergency line and told a dispatcher there was a suspicious person sitting on the front steps of the house. *Id.*, ¶¶32–33.

The dispatcher dispatches the call to Defendant City of Monona Police Department Officer Jared Wedig. *Id.*, ¶34. The dispatcher does not report whether the call is urgent. *Id.*, ¶37. Instead, she simply relays to Wedig that: (1) a resident of Arrowhead drive had called; (2) she saw someone sitting on the front step of 5111 Arrowhead; (3) and she thought it was suspicious because the neighbor had passed away and the house was vacant. *Id.*, ¶35.

### C. Wedig arrives on Arrowhead and enters the house with almost no investigation.

Although it's maybe not always the case, there were no facts here suggesting that the house had been broken into *because it had not been broken into. See id*, ¶¶48–58, 131. An independent consulting group would later say of Wedig's actions that day:

> Wedig stated he did not know if someone might be a hostage inside. *Wedig's analysis of the situation progresses from a person sitting on a stoop call, to vacant house possibly being burglarized, to a possible hostage situation in a matter of minutes.* While Wedig should be commended for thinking of possible scenarios, it is important that his actions be guided more by the facts of the specific situation.

*Id.*, ¶135 (footnote omitted and emphasis added).

When Wedig arrives, the caller is gone. *Id.*, ¶39. Instead, he finds her boyfriend. *Id.*, ¶38. The boyfriend relays additional information that: (1) the house had been vacant for about a year; (2) it had been being maintained by Mark Rundle; (3) the house had not been listed for sale; (4) there should not be anyone at the house; (5) there had been a black car parked by the house but it was now gone; (6) the person sitting on the steps was a younger male, about six feet tall, and was wearing gray sweatpants and a blue sweatshirt. *Id.*, ¶40.

Nobody—not the caller, not dispatch, not the caller's boyfriend—mentions anything about an emergency, anything about a break-in, or anything about a burglary. *Id.*, ¶¶33, 35–37, 40, 117.

Wedig then walks over to 5111. *Id.*, ¶ 43. He peeks in the window but sees nothing out of the ordinary. *Id.*, ¶44. He walks up to the door and again sees nothing out of the ordinary. *Id.*, ¶48. That's it. It's daylight out. *Id.*, ¶53. Wedig doesn't walk around the house. *Id.*, ¶55. He doesn't see any cars in the driveway or out front. *Id.*, ¶54. He doesn't go talk to any other neighbors. *Id.*, ¶58. He doesn't try to get ahold of Rundle. *See id.*, ¶59. He doesn't knock. *Id.*, ¶56. He doesn't ring the doorbell. *Id.* He doesn't announce his presence. *Id.*

Wedig then twists the knob to the front door, finds it unlocked, pushes it open slightly, and closes it again. *Id.*, ¶¶45–47.

Wedig then opens the door again, without further investigation, and again without knocking, ringing the doorbell, or announcing himself. *Id.*, ¶61. This time he leaves the door ajar. He leans in through the open door and says, "Police department

[pause] anyone here?" *Id.*, ¶62. He then radios to dispatch, "I got an open door," but fails to mention he's the one who opened it. *Id.*, ¶¶65–66.

Wedig then contemplates his next steps. He stands by the open door and radios Officer Schneider, asking him how close he is. *Id.*, ¶67. And now he hears a voice coming from inside, through the open door. *Id.*, ¶68. He radios that there's someone in the house. *Id.*, ¶68. He remains put, however, for the time being. He continues to wait by the door, and hears the voice a couple more times. *Id.*, ¶69. (This is Furdge talking to himself and singing while doing his laundry. *Id.*, ¶¶30, 69.) He doesn't believe the person in the house heard him or knew he was there. *Id.*, ¶70.

### D.  Wunsch arrives and enters the house with Wedig without further investigation.

Defendant Monona Police Department Officer Luke Wunsch hears Wedig radio that there's someone in the house and responds to Arrowhead Drive. *Id.*, ¶71, 75. He's not in a rush; he doesn't use his emergency lights or siren and he walks (instead of runs) up to Wedig by the front door. *Id.*, ¶¶72–73. Wunsch, upon arrival, knows there was a call about a suspicious person sitting on front steps, the house was supposed to be vacant, Wedig reported an open door, and Wedig believed there was someone in the house. *Id.*, ¶75. Wunsch doesn't think Wedig has consent to enter the house (he doesn't) and he doesn't think Wedig has a warrant to enter the house (he doesn't). *Id.*, ¶¶59–60,76. He also doesn't know that Wedig was the one who opened the door and that Wedig never knocked or announced himself. *Id.* ¶77. Wunsch also sees no signs of a break in or anything else suspicious. *Id.*, ¶¶79–80.

7

Wedig and Wunsch then see Monona Police Department Lieutenant Wiegel, and they motion him to go around back. *Id.*, ¶83. Wedig is whispering to Wunsch. *Id.*, ¶82. Wedig and Wunsch agree they are going to enter the house, they draw their firearms and let dispatch know. *Id.*, ¶¶85–86.

### E.  Wedig and Wunsch find a shocked Furdge inside the house.

Wedig and Wunsch enter the house, guns drawn. *Id.*, ¶86. They're now in the living room. *Id.*, ¶89. Through the living room and down a hallway is Furdge's guest bedroom. *Id.*, ¶¶30, 88–89, 91, 93. Wedig points his weapon down the hallway. *Id.*, ¶88. There's no signs of break-in in the house. *Id.*, ¶89. After about 10 seconds, Wedig finally announces "Police Department! Come out with your hands up!" significantly louder than when he opened the door earlier. *Id.*, ¶¶63, 90; *compare id.*, ¶90 *with* 62, i.e. Ex. A (Wedig Body Camera) at 00:33–45 *with* Ex. A at 4:56–5:10.

Furdge hears him and says "huh?" *Id.*, ¶91. Wedig yells for him to "Come out with your hands up!" *Id.*, ¶92. Furdge says "okay" and walks slowly out of the bedroom, down the hallway into the living room with his hands up. *Id.*, ¶93. He's wearing a white undershirt, gray sweatpants, and flip-flop sandals. *Id.*, ¶94. He's shocked to see the officers. *Id.*, ¶94. The officers ask him who else is in the house and Furdge says it's just him. *Id.*, ¶98. Wunsch tells Furdge that he doesn't live there. *Id.*, ¶99. And Furdge responds, softly and politely, "my coach's house, coach Rundle, he let me and Toren stay here. You can call and ask him." *Id.*, ¶100.

8

**F. Wunsch recognizes Furdge but lets Wedig handcuff him anyway.**

Wunsch knows Rundle and recognizes the name Toren, who was an accomplished football player for Monona Grove High School, where Wunsch worked as a school resource officer. *Id.*, ¶¶102–103. Toren is Toren Young, who's still at his job interview. *Id.*, ¶25.

Wunsch knows Furdge too from his work at Monona Grove High School, and recognizes him. *Id.*, ¶104. Furdge knows Wunsch as Officer Luke. *Id.*, ¶105. Wunsch calls Furdge by his first name, "Keonte." *Id.*, ¶101. The officers then put their weapons down. *Id.*, ¶101.  Wunsch knew Furdge to be a good kid. *Id.*, ¶¶106–107.

Despite him recognizing Furdge and knowing Rundle and Young, Wunsch allows Wedig to handcuff him. *Id.*, ¶109.

And Wedig handcuffs Furdge, despite the fact that he saw no signs of break in, that Wunsch recognized Furdge, that Furdge knew the name of the person he was told controlled the house, and that Furdge was wearing an undershirt, sweatpants, and flip-flops. *Id.*, ¶¶108–112. Neither officer ever performs a protective sweep of the house. *Id.*, ¶113. And Wedig knew of no facts suggesting that Furdge might be armed. *Id.*, ¶114.

**G. Officer Schneider, having done minimal investigation, arrives and clears up the situation.**

Monona Police Department Officer Schneider arrives a short time later. *Id.*, ¶118. He had spoken to another neighbor. *Id.*, ¶118. With that only brief amount of investigation, he had got to the bottom of it. *Id.* He explains to Wedig and Wunsch that Furdge was supposed to be there and that Rundle was allowing two people to live at the house for a couple months. *Id.* Wunsch finally tells Wedig to remove the handcuffs. *Id.*, ¶119. The

officers then allow Furdge to go to his room to grab his wallet, unescorted by officers. *Id.*, ¶121. Neither officer ever asks Furdge if it's okay for them to stay in the house. *Id.*, ¶123. Neither officer ever asks Furdge if he wants to put on a shirt. *Id.* Wedig leaves the house, and Wunsch stays with Furdge. *Id.*, ¶124. The two make small talk. *Id.* Again, this is right after the death of George Floyd. *Id.*, ¶8. And Wunsch tells Furdge that he's glad he recognized him, laughs to himself, and then tells Furdge, "nobody wants that interaction." *Id.*, ¶125.

### H. The incident goes viral.

No one is able to get ahold of Rundle and the officers leave Furdge in the house. *Id.*, ¶128. Later that day, Wedig talks with Rundle, who tells him that Rundle did not give Furdge permission to be in the house, but Young must have because the two are close friends. *Id.*, ¶130. The incident, including the body camera footage, then goes viral and makes national and international news. *Id.*, ¶132.

## III.   STANDARD

The summary judgment standard is familiar. It is well established that summary judgment is only warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding whether there are any genuine issues of material fact, the court must view the record in the light

most favorable to the nonmoving party and draw all reasonable inferences in his favor. *Id.* at 255.

"The court may not weigh the evidence or decide which testimony is more credible. Even if one side's story is more believable, the court must avoid the temptation to decide which party's version of the facts is more likely true." *Pullen v. House*, 88 F. Supp. 3d 927, 935–36 (W.D. Wis. 2015) (quoting *McCann v. Iroquois Memorial Hospital*, 622 F.3d 745, 752 (7th Cir. 2010)) (citations, alterations and internal quotations omitted). *See also Anderson*, 477 U.S. at 249–255 (summary judgment is unwarranted "[i]f reasonable minds could differ as to the import of the evidence"). The "choice between reasonable inferences from facts is a function of a factfinder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.*

Here, no reasonable juror could find in favor of Defendants Wedig and Wunsch. Even if all facts and inferences are construed in their favor, they still have no justification for entering the house and detaining Furdge.

No trial, except on damages, is needed because we have video. When there's video, the summary judgment standard adjusts. *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379–80 (2007)). When there's video, the Court should "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380–81; *see* Ex. A (Wedig Body Camera) *and* Ex. B (Wunsch Body Camera).

Because this is a civil case, Furdge carries the burden of proof. *Bogan v. City of Chicago*, 644 F.3d 563, 568–71 (7th Cir. 2011). After Furdge establishes that the house was

searched without a warrant, the burden shifts to Wedig and Wunsch to "come forward" with evidence of exigent circumstances. *Id.* at 571. If they do so, Furdge maintains the ultimate burden of persuasion. *Id.* at 570. Wedig and Wunsch here have no proof of exigency to come forward with. They have, at a bare minimum, proof of some reasonable suspicion based on the non-emergency-line caller. No additional facts suggest that any crime had occurred, was occurring, or was going to occur. Thus, no reasonable jury, even taking facts and inferences in Wedig and Wunsch's favor, could find that they didn't violate Furdge's constitutional right to be free from unreasonable search and seizure.

## IV.   ANALYSIS

Wedig and Wunsch violated Furdge's constitutional rights by entering the house and detaining him without consent, without a warrant, and without exigent circumstances. U.S. Const. Amend. IV. These are unreasonable seizures. *Id.* Because Furdge was an overnight guest at 5111 Arrowhead Drive, he has Fourth Amendment standing to assert these claims. *Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990). He therefore had an objective and subjective expectation of privacy. *Id.* at 95–96.

Wedig opened a door without legal justification in clear violation of *Payton v. New York*, 445 U.S. 573 (1980). *See Richards v. Wisconsin*, 520 U.S. 385, 387 (1997).

Wedig opened the door a second time without legal justification, again in clear violation of *Payton*. *See Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005). Wedig's own unlawful behavior cannot be the basis for exigent circumstances. *Kentucky v. King*, 563 U.S. 452, 459–60 (2011).

Wedig and Wunsch then entered the house without legal justification, again in clear violation of *Payton. See Reardon v. Wroan*, 811 F.2d 1025 (7th Cir. 1987); *see Frunz v. Tacoma*, 468 F.3d 1141 (9th Cir. 2006). Wedig's own unlawful behavior cannot be the basis for exigent circumstances. *Kentucky v. King*, 563 U.S. 452, 463 (2011).

Even if Wunsch was justified in relying on Wedig, after he saw Furdge, he remained in the house in clear violation of *Payton. See Hawkins v. Mitchell*, 756 F.3d 983 (7th Cir. 2014). Finally, Wedig and Wunsch's decision to detain Furdge inside the house was unlawful not only because they had no authority to be there, but also because they did not have reasonable suspicion to detain him. *Terry v. Ohio*, 392 U.S. 1, 28 (1968).

### A. Fourth Amendment principles—the home is sacred.

In violating Furdge's right to be free from unlawful seizure, Wedig blew past the clear warnings of the Supreme Court. An officer cannot enter a home without a warrant, consent, or exigent circumstances. Wedig had none of the three. When the courts have announced this rule, time and again, they've explained why the rule exists. They've explained the principles behind the rules. They've warned of the dangers of warrantless entry into the home. Wedig violated the rules, violated the principles, and caused the dangers he was warned of. And Wunsch too, in unreasonably relying on Wedig, violated the rules in the face of the principles supporting them.

### 1. Entry into the home

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton*, 445 U.S. at 585 (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972). Thus, warrantless searches and seizures

inside the home are "presumptively unreasonable." *Id.* Entry into the home, absent exigency, is a decision that must be made by a neutral, judicial magistrate. *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). To protect against the chief evil of physical entry of the home and to ensure that, when possible, entry to the home is decided by the judiciary, we have our rule: An officer cannot enter a home unless he has a warrant, consent, or exigent circumstances. *Kentucky v. King*, 563 U.S. 452, 459–60 (2011); *Reardon v. Wroan*, 811 F.2d 1025, 1027–28 (7th Cir. 1987) (*per curiam*) (citing, *inter alia*, *Payton*, 445 U.S. at 590) ("Therefore, absent exigent circumstances or proper consent the police may not enter a person's home without a warrant even if probable cause exists to support an entry to search or arrest.").

Wedig and Wunsch's warrantless, nonconsensual entry without exigent circumstances ran headfast into these principles. By not investigating further, by not seeking a warrant, they committed a chief evil. Houses often have people living there. They should not have been astonished to find someone legally living in a home that had no signs of forced entry.

## 2.  Knocking and announcing

The Fourth Amendment requires officers to knock and announce their identity and purpose before they break open a door. *Richards*, 520 U.S. at 387. Opening an unlocked door without permission is a "break open." *Green v. Butler*, 420 F.3d 689, 698, n.7 (7th Cir. 2005). Thus, the "knock and announce" principle is one factor in analyzing the reasonableness of a warrantless home entry. *Leaf*, 400 F.3d at 1083. Officers can only depart from this rule if knocking and announcing would be dangerous, futile, or allow

the destruction of evidence. *Id.* at 1084. And the purposes of the rule are clear. The first is to protect the privacy of occupants to allow them to prepare and allow them "to pull on clothes or get out of bed." *Green*, 420 F.3d at 698 (quoting *Richards*, 520 U.S. at 393). The second is to protect officers from exposing themselves to "the risk that an occupant would mistake their entry for an invasion and reasonably would take defensive measures to protect himself from the perceived, though mistaken, threat." *Id.* And the third is to protect occupants, "including innocent third parties for whom the surprise of an unannounced entry by law enforcement officers might elicit panic or other forms of irrational conduct—action that easily can be misapprehended by law enforcement officers and result in deadly defensive measures on their part." *Id.*

Wedig and Wunsch's warrantless, nonconsensual entry without exigent circumstances shows these risk, justifying the rule. They surprised a legal occupant who was scared and in an undershirt, unprepared for police interaction. They created a risk that Furdge would respond to unknown invaders yelling at him. And they created a risk of misapprehending the situation and using lethal force on Furdge, just days after the death of George Floyd. Or as Wunsch told Furdge, after explaining he was glad he recognized him, "nobody wants that interaction." PPFOF, ¶125.

### 3. Abuse of officer discretion

The sanctity of the home is so important in our Fourth Amendment scheme that entry into the home, absent an emergency, is a decision that must be made by a judge in issuing a warrant. *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). The decision is by design not left to the discretion of an officer "engaged in the often competitive enterprise of ferreting

out crime." *Id.* Indeed, even the basic reasonable suspicion standard, which is left to officer discretion, is based on the trust that officers will be reasonable and only detain people on more than a hunch. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Reasonable suspicion does not exist where the decision to detain is "the product of a volatile or inventive imagination." *Id.* at 29.

The purposes of these limits on discretion are on display here. First, Wedig and Wunsch should have obtained a warrant. They had time to do so, the back of the house was covered and Furdge didn't know officers were outside. Had they done so, the judge would've denied it for lack of probable cause and told them to continue investigating. Had they tried to obtain a warrant, the neighbor who knew Furdge and Young had moved into the house likely could've told the officers what was going on. Wedig's unreasonably inventive imagination, as a consulting group later found, escalated the situation "from a person sitting on a stoop call, to vacant house possibly being burglarized, to a possible hostage situation in a matter of minutes." PPFOF, ¶135.

### B.  Wedig unreasonably seizes Furdge by entering the house.

There are four potential Fourth Amendment violations by Wedig here. If the Court finds one, it need not continue with the rest.

First, Wedig committed a Fourth Amendment violation when he opened the door the first time, upon walking up to the house. Second, in the alternative, he committed a Fourth Amendment violation the second time he opened the door, when the only new fact he learned was that the door was unlocked. Third, in the alternative, he committed a Fourth Amendment violation when he entered the house with Wunsch, when the only

new fact he learned was that there was someone inside the house. Finally, if the Court finds that none of those are violations, the Court should conclude that once Furdge mentioned Rundle and Wunsch recognized Furdge, the entry into the house became unreasonable and Wedig should've left the house or received consent to stay there.

To open the door and enter the house, Wedig needed a warrant, consent, or exigent circumstances. *Reardon*, 811 F.2d at 1027–28; *Payton*, 445 U.S. at 590. He had none.

Exigent circumstances exists when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U.S. at 460 (alterations and quoted source omitted). A situation is exigent when (1) there's a need to render emergency aid; (2) officers are in hot pursuit of a felon; and (3) to prevent the imminent destruction of evidence. *Id.*; *see Sutterfield*, 751 F.3d at 557 (collecting cases). Besides an exigency, there also needs to be probable cause. *Sutterfield*, 751 F.3d at 557 (analysis is of the "entire period after they had a right to obtain a warrant . . ."); *Reardon*, 811 F.2d at 1027–28. And the probable cause needs to be that of a serious crime. *Hawkins*, 756 F.3d at 992.

**1. Wedig did not have probable cause because he knew of no *particular* facts of a crime. And the situation was not exigent because there was no emergency.**

A neighbor called the non-emergency line to report a suspicious person. Wedig knew only what the dispatcher told him and what the caller's boyfriend told him upon arrival. Thus, he knew: (1) a resident of Arrowhead drive had called; (2) she saw someone sitting on the front step of 5111 Arrowhead; (3) and she thought it was suspicious because the neighbor had passed away and the house was vacant; (4) the house had been vacant for about a year; (5) it had been being maintained by Mark Rundle; (6) the house had not

been listed for sale; (7) there should not be anyone at the house; (8) there had been a black car parked by the house but it was now gone; (9) the person sitting on the steps was a younger male, about six feet tall, and was wearing gray sweatpants and a blue sweatshirt. *Id.*, ¶¶35, 40.

### a. Wedig had no basis to suspect a serious crime.

This is, at the most, reasonable suspicion of trespassing if Wedig suspected the supposedly suspicious person had gone inside the house. It suggests that the lawful owner was not around. Thus, the elements of criminal trespass to dwellings, under Wisconsin law are: (a) a person enters or remains in the dwelling of another, (b) without consent, under (c) circumstances tending to create or provoke a breach of the peace. Wis. Stat. § 943.14(2). It's a Class A misdemeanor. *Id.* Burglary is essentially that plus the intent to steal or commit a felony. Wis. Stat. § 943.10(1m)(a). And Burglary is a felony. *Id.* Wedig had no knowledge that the supposedly suspicious person had entered the house, only that they were gone. And more importantly, there was no evidence of at all of a break-in and no one at all mentioned they were concerned of a break-in or burglary. It was broad daylight. There was no getaway car. Furdge had been merely sitting on the front steps.

Exigent circumstances rarely exists when the suspected crime is a misdemeanor. *Hawkins*, 756 F.3d at 992 (the Seventh Circuit has understood Supreme Court case law to hold "that, at a minimum, exigent circumstances do not exist when the underlying offense is minor, typically a misdemeanor" (quoting *Reardon*, 811 F.2d at 1028). The word "rarely" is appropriate, only if one construes exigent circumstances to encompass non-probable cause, emergency-based reasons for entering a home, like to render emergency

aid. *See Sutterfield*, 751 F.3d at 558 (discussing the relation of the two doctrines). Lesser forms of trespass are civil forfeitures or torts in Wisconsin. *See* Wis. Stat. § 943.13 (Trespass to land); *see Munger v. Seehafer*, 890 N.W.2d 22 (Wis. Ct. App. 2016) (Intentional trespass is a personal tort).

And even reasonable suspicion of criminal trespass here is bare bones. The only thing suggesting that crime was afoot was that a neighbor thought another person was "suspicious." Of course, it's not a crime to be suspicious. Nobody reported anything to Wedig about a break-in, about a burglary, about drugs, about a weapon, or any other type of criminal activity. This is partially, we know in hindsight, because there was no criminal activity to report. The fact that the person was sitting down on the steps, instead of for example walking around and looking in windows, also suggests that something innocuous was happening. It was morning and light outside—hardly the usual time for criminal activity. Finally, the front door was unlocked. It's not unusual for a homeowner to leave his front door unlocked when he's home during the day. That the door was unlocked, on a house that had been vacant for a year, strongly suggests that the person on the porch had access to the keys to the place, which further suggests he had a right to be there.

### b. Wedig had no reason to believe there was an emergency.

A situation is exigent when (1) there's a need to render emergency aid; (2) officers are in hot pursuit of a felon; and (3) to prevent the imminent destruction of evidence. *King*, 563 U.S. at 460; *see Sutterfield*, 751 F.3d at 557 (collecting cases). First, there was no reason to believe anyone was hurt or in danger. The house was supposed to be vacant, meaning

there would be no one inside it; there's no cars by the house; there's no mention of weapons; and it was daytime. The only person anyone mentioned was the reported person sitting on the steps, who no one claims needed any help. Second, there's nothing here suggesting the hot pursuit of a felon. And third, there's nothing to suggest that any evidence would be destroyed. There was not even probable cause that a crime was committed, so there's no evidence to preserve. Suspicious person, trespasses, and burglaries don't have much in the way of destroyable evidence. And Wedig had no indication that if there was someone in the house, they would know that police were outside. Finally, Wedig had time to get a warrant. PPFOF, ¶¶139–142. Although he's not trained to apply for one himself, he could've radioed to have one filled out and waited. *Id.*, ¶¶140–141. Wiegel was covering the back of the house, Wedig had the front, Wunsch was there for further help, and Schneider was on his way too. There was no occupant, because the house was supposedly vacant, to be concerned about, and the person in the house did not know the police were there. *See also Hawkins v. Mitchell*, 756 F.3d 983, 992–94, 996 (7th Cir. 2014) (concluding, without explanation of the time needed to obtain a warrant, that although officers had probable cause for an arrest, there were not exigent circumstances and entry into the home was a constitutional violation).

**c.   This case is *Reardon* without the call of an ongoing burglary.**

There's no exigent circumstances here because the only thing reported was a "suspicious person."

20

Compare the circumstances here to the Seventh Circuit's most on point case, in which the court concluded there could have been exigent circumstances because someone reported a *burglary in progress*. *Reardon*, 811 F.2d at 1028.

In *Reardon* two frat brothers sued a police officers for entering their frat house without consent and without a warrant. *Id.* at 1026. There were no signs of a break-in. *Id.* But there had been a call of a burglary in progress, the back door of the house was either wide-open or unlocked in December, there was a car out front and the officers thought the house should be vacant, and it was Christmas break and the officers knew that burglaries often occurred on campus housing over Christmas break. *Id.* The court concluded that, based on disputed facts of whether there was time for the officers to obtain a warrant, the issue of probable cause could go either way and should be left to a jury. *Id.* at 1029.

As to exigent circumstances, the court concluded that there was exigency almost entirely based on the fact that there was a burglary in progress reported. *Id.* at 1029.

Here, in contrast, there was no reported burglary. There was simply a report, on a non-emergency line, of a suspicious person, sitting on the front steps, of a house that was supposed to be vacant. The *Reardon* court found there could be probable cause based on the burglary in progress call. *See also Leaf*, 400 F.3d at 1081 (officers justified in warrantless entry after a 911 caller reported seeing someone break into a house and the officers discovered evidence of a break in). Here that crucial fact is missing. And if Wedig thought there was a burglary, then that thought was the unreasonable "product of a volatile or inventive imagination." *Terry*, 392 U.S. at 29.

**d. This case is like *Murdock* without the risk of someone being hurt.**

In *Murdock*, the Ninth Circuit concluded that there were exigent circumstances because of a reasonable fear by the officers that someone's life was in danger, even though they found there wasn't probable cause. *Murdock v. Stout*, 54 F.3d 1437, 1440 (9th Cir. 1995) abrogated for using a lower "mild exigency" standard, *United States v. Ramirez*, 523 U.S. 65, 69–70 (1998). That arguably, depending on your classification of the doctrines, means the court found that the emergency aid doctrine applied, rather than exigent circumstances. *See Sutterfield*, 751 F.3d at 558 (discussing the relation of the two doctrines).

Regardless of classification, the court found probable cause only because it thought the owner of the home might be in danger. *Murdock*, 54 F.3d at 1442. In *Murdock*, a caller reported that a passerby told him that they had seen a suspicious person. *Id.* at 1439. Dispatch told police officers that a burglary had occurred. *Id.* (there was some confusion about whether the dispatcher reported a burglary, *see* n.1, but the court characterized it as a "possible burglary."). Officers showed up at the house. They saw no signs of a break-in but did see that the back sliding door was open. *Id.* It was dark out. *Id.* The officers looked inside and saw that the tv was on and that lights were on. *Id.* The officers then announced their presence, shouting "Fontana Police. Anybody home?" *Id.* They also heard the telephone ring, but nobody answered. *Id.* The officers went in through the open door and discovered Clyde Murdock, who eventually sued. *Id.*

The Ninth Circuit concluded that the call for suspicious activity, by itself, would not have been enough to create exigent circumstances: "Based on these facts, we doubt that there would be sufficient probable cause to support entry." *Id.* at 1441 (comparing to

several cases with signs of a break-in). But, the court concluded, the officers also noticed signs suggesting someone should've been home. *Id.* And the officers "prudently attempted to make contact with the resident, no doubt to make sure the resident was safe in light of the officers' concern that a burglary or other crime might have occurred." *Id.* at 1442. And thus the scaled were tipped toward probable cause. *Id.* The Court also used a later-abrogated standard of mild exigency to conclude there were exigent circumstances. *Id.*; *see Ramirez*, 523 U.S. at 69–70.

In comparison, here, the crucial facts are missing. There's no report of a burglary. It was daytime. There were no signs that anyone was at the house, indeed it was supposed to be vacant. There was no open door. And Wedig never tried to contact the homeowner, announce himself, or knock. The scales are not tipped. What's striking here is the *lack* of facts, the *lack* of investigation. Wedig didn't even walk around the house. If he had, he might've seen Furdge in the window, which would've been jarring but Wedig never would've needed to enter the house. Wedig can point to nothing other than a report of a suspicious male who was then gone upon his arrival. If that makes probable cause, the Fourth Amendment becomes subservient to the ability of an officer to be creative. The Court here should not be persuaded by non-particular fears of there *could've* been another person, there *could've* been a firearm,  there *could've* been a burglary, there *could've* been a hostage.

**e.  That Wedig didn't announce himself makes his entry into the house more unreasonable.**

And as a last factor, Wedig never knocked or announced himself. He didn't knock or announce before he opened the door the first time. He didn't knock or announce before

he opened the door the second time. Only then, did he announce he was there, but not very loudly, and he knew the person inside didn't hear him. He only truly announced himself once he was already in the house for a good 10 seconds. This all could've been avoided if Wedig had just rang the doorbell. Wedig should've knocked an announced unless he had reasonable suspicion to believe it would be dangerous, futile, or inhibited criminal investigation. *Leaf*, 400 F.3d at 1084. The knock and announce analysis is separate from the exigent circumstances analysis. *Id* at 1082, n.20.

Wedig had no reasonable suspicion to think that the person sitting on the steps might be dangerous. Furdge was sitting on a front porch in broad daylight and no one reported any threats or evidence of a weapon.

Wedig had no reasonable suspicion that it would've been futile. His concern was that someone was inside the home.

And Wedig had no reasonable suspicion to believe it would've inhibited his investigation. Indeed, it would've solved it. But even from Wedig's position, the suspicious person had displayed no signs of burglary or drugs or anything else that could've quickly been disposed of. And after Wunsch arrived, Wedig knew that Wiegel was going around to watch the back of the house.

### f. Wedig should've known his presence in the house was unlawful once Furdge mentioned Rundle and Wunsch recognize Furdge.

Finally, even if Wedig had probable cause and exigent circumstances to enter the house, he should've realized his presence there was unlawful after speaking with Furdge. *Hawkins v. Mitchell*, 756 F.3d 983, 994 (7th Cir. 2014) (concluding that an officer who should've discovered there was no justification for staying in a home violated the Fourth

Amendment). Furdge was polite and compliant. He was wearing flip-flops, an undershirt, and sweatpants—hardly burglarizing clothes. Wunsch recognized him by name, prompting Wunsch to lower his weapon. And most importantly, Furdge mentioned the name of Rundle, who Wedig knew was the person controlling or maintaining the house. At that point, any reasonable officer would realize the mistake he had just made. Again, there were no facts suggesting someone was hurt, someone was committing a crime other than perhaps a light trespass, or that anyone was dangerous. The explanation presented itself in the form of Furdge explaining it directly to Wedig and Wunsch. They should've left the house or asked permission to stay there.

### C. Wunsch violated Furdge's Fourth Amendment rights by unreasonably staying in the house after he recognized Furdge.

The Court should also conclude that Wunsch violated Furdge's rights. Assuming that Wunsch reasonably relied on Wedig, Wunsch should've realized his mistake when he recognized Furdge and Furdge mentioned Rundle and Young.

When Wunsch arrived, he knew that there had been a report of a suspicious person sitting on the steps, that Wedig had found an open door (because Wedig failed to explain that he opened it), and that Wedig thought someone was inside the house. Wunsch did not think that Wedig had a warrant or consent to enter the house. Wunsch didn't know whether Wedig had looked for signs of a break-in, although Wedig saw no signs of a break in. And Wunsch didn't know whether Wedig had announced himself, knocked, or rang the doorbell.

The same rules and principles as above apply to Wunsch, except that he is also entitled to reasonably rely on Wedig's legal conclusions. *See Duran v. Sirgedas*, 240 Fed. Appx. 104,

115 (7th Cir. 2007). But those conclusions must be reasonable. While Wunsch has a better basis for entry than Wedig, given that Wunsch didn't know the details of Wedig's investigation (or lack thereof), there's still a dearth of information that would justify warrantless entry into a house.

Even so, Wunsch may have reasonably assumed that Wedig had a basis for entering the house since he had already planned to do so. *Hawkins*, 756 F.3d at 994. But once he recognized Furdge and recognized the names Toren and Rundle, he should've known that Wedig had made a mistake and should've left the house or asked permission to stay.

In *Hawkins*, the Seventh Circuit concluded that an officer was reasonable in entering a home where another officer already was. *Id.* at 994. But, the court concluded, once the officer saw a lack of exigency, once he saw a "lack of weapons, threats, or physical aggression" from the suspect, the second officer had time to ask the first officer "why they were inside and to recognize the absence of any possible justification for staying." *Id.*

Wunsch, like the second officer in *Hawkins*, "should have taken advantage of that opportunity." *Id.* Instead, Wunsch remained in the house without consent, without a warrant, and without any other legal reason to be there. Thus, the Court should conclude Wunsch, like Wedig, violated Furdge's Fourth Amendment right to be free from unreasonable search and seizure under *Payton*. 445 U.S. at 586.

**D.  The officers also unreasonably detained Furdge.**

Finally, because the officers were unlawfully in the house, the Court should conclude that they unreasonably detained Furdge. An investigatory detention requires reasonable

26

suspicion. *Terry*, 392 U.S. at 27–28. Both officers, Wedig and Wunsch, had no reasonable suspicion that Furdge had committed a crime after Wunsch recognized Furdge and Furdge mentioned Rundle and Young.

Nor can the officers own unlawful conduct create an exigency that might justify detention for officer safety. *See King*, 563 U.S. at 469 (holding that "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment").

## V.  CONCLUSION

Defendants Wedig and Wunsch unlawfully entered the house, in which Furdge was an overnight guest, without consent, without a warrant, and without exigent circumstances. And Wedig and Wunsch detained Furdge without reasonable suspicion. The Court should conclude that no jury could find that Wedig and Wunsch had a legal justification for entering the house. And therefore the Court should grant Furdge's motion for partial summary judgment against Wedig and Wunsch and allow this case to proceed to trial on the issue liability of Defendant City of Monona and on the issue of damages.

Respectfully submitted,

Dated: October 15, 2021,

STRANG BRADLEY, LLC
Attorneys for Plaintiff

/s/ John H. Bradley
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722

Strang Bradley, LLC
613 Williamson St., Ste. 204
Madison, WI 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com